IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| Plaintiff, | : |
| | :    Case No. 3:09cr165 |
| vs. | : |
| |    JUDGE WALTER HERBERT RICE |
| MICKEY FUGATE, | : |
| Defendant. | : |

DECISION AND ENTRY SUSTAINING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE (DOC. #21)

---

Defendant Mickey Fugate ("Defendant" or "Fugate") is charged in the Indictment (Doc. #14) with one count of interfering with commerce by the threat or the actual use of physical violence, in violation of 18 U.S.C. § 1951(a); one count of using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); and one count of possessing a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g). Those charges stem from the robbery of the Kwik N Kold Drive-Thru Convenience Store ("Kwik N Kold") located at 1316 Wyoming Street, Dayton, Ohio, on November 14, 2009. Much of the incriminating evidence concerning that crime was seized from the residence of

Fugate's girlfriend,[1] located at 140 Drummer Avenue in Dayton, from the backyard of that residence and from a black Cadillac parked thereon. The Defendant has filed a motion, requesting that the Court suppress that evidence. See Doc. #21. On November 1, 2010, and January 13, 2011, this Court conducted an oral and evidentiary hearing on that motion. The parties have filed their post-hearing memoranda (see Docs. ##31, 33 and 34), and the Court now rules on the Defendant's Motion to Suppress Evidence (Doc. #21), beginning its analysis by setting forth its factual findings.

During the afternoon of November 14, 2009, a lone gunman entered the Kwik N Kold at 1316 Wyoming, displayed his firearm and demanded money. The gunman was wearing a green mask and a dark blue, hooded sweatshirt. During the course of the robbery, the lone gunman shot the male clerk working at the Kwik N Kold.[2] The gunman left that commercial establishment with stolen funds in the sum of about $465.00, a drawer from the cash register and a tip jar. He drove away in a black, two-door Cadillac, without visible license plates. As the gunman drove away in that vehicle, citizens in their automobiles followed him for a number of miles, informing the dispatcher for the Dayton Police Department of their progress. The dispatcher, in turn, passed the information provided by the citizens to police officers who were searching for the gunman in the black Cadillac. In the

---

[1]140 Drummer Avenue is the residence of the Defendant's girlfriend. The Defendant told officers that he lived at 1825 Brookline Avenue. However, while denying the Government's oral request to overrule the Defendant's motion, this Court found it to be a reasonable inference that Defendant spent nights in the Drummer Avenue residence and that, therefore, he had a legitimate expectation of privacy in it. The Court afforded the Government the opportunity of revisiting the issue in post-hearing briefing; however, the Government has not done so.

[2]His wound was not fatal.

main, the gunman drove in an area of East Dayton bounded by Josie Street and Xenia Avenue on the north and south and by Boltin Street and Samuel Avenue on the east and west. When the gunman started shooting at the citizens who were following him, they stopped their pursuit.

Officer Michael Saylors ("Saylors") of the Dayton Police Department was among those members of that police force who were searching for the gunman. While driving in the alley that runs north and south between Drummer and Samuel Avenues, and looking for the black Cadillac without licence plates,[3] Saylors saw the top 12 to 18 inches of a black vehicle parked in the back of the residence located at 140 Drummer Avenue, about 16 or 17 minutes after the robbery. That house is located <u>less</u> than two miles from the scene of the robbery. The vehicle was parked between the rear of that residence and a blue, above-ground swimming pool. The swimming pool blocked the view of most of the vehicle from the alley. Continuing his investigation, Saylors entered the backyard of that residence,[4] where he could clearly see that the vehicle, the top of which he had previously seen, was a black Cadillac without visible licence plates. He could also see through the open door of that vehicle that currency was strewn over its front seat. In addition, there was a path of currency from the black Cadillac leading toward the front door of residence at 140 Drummer Avenue. A cash register drawer and tip

---

[3]Drummer is the street to the west of Samuel Avenue and is outside the small area, described above, in which officers were concentrating their search for the gunman.

[4]That residence had a chain link fence in its front and wooden privacy fences on either side, but no fence in its rear, the direction from which Saylors entered the backyard.

jar were in the path of currency. Saylors made these observations 29 minutes after the robbery.

Shortly after Saylors discovered the black Cadillac, currency and other evidence, a Montgomery County Sheriff's Deputy arrived at the residence located at 140 Drummer Avenue, accompanied by his dog.[5] The dog followed the trail of money from its beginning at the Cadillac, past where it ended, and continued until it (the dog) reached the front door of that residence. There was no indication that the dog alerted on the open widow at the back of that house.

In the meantime, other Dayton police officers were arriving at 140 Drummer Avenue, including Officers Jon Zimmerman ("Zimmerman") and Brett Lynott ("Lynott"). When no one responded to officers knocking on the doors of that residence, and after announcing themselves as police officers, Zimmerman and Lynott, both doors to the house being locked, climbed through an open window. Once inside that residence, they encountered Fugate and took him into custody. After Zimmerman and Lynott had handed Fugate out the window to Saylors,[6] they conducted a sweep of the interior of that residence, during which they saw a dark blue hooded sweatshirt and a green mask. The search took ten minutes and included a search of the attic.

Based upon Saylors' observations and those of Zimmerman and Lynott, Detective Sean Copley ("Copley") of the Dayton Police Department swore out an

---

[5]Saylors had kept the Dayton Police Department dispatcher informed about the progress of his investigation. She, in turn, informed other officers of his discoveries.

[6]Fugate was then placed in the rear of Saylors' cruiser, in which he was ultimately transported downtown to be interviewed by a detective.

- 4 -

affidavit, with which he was able to obtain a search warrant from Judge John Pickrel of the Dayton Municipal Court, authorizing officers to search the residence located at 140 Drummer Avenue, its curtilage and the black Cadillac parked thereon. When that warrant was executed, incriminating evidence was seized, much of which had already been seen by officers.[7]

In support of his request that the Court suppress the evidence that was seized when the search warrant was executed, Defendant principally argues that Saylors' initial warrantless entry onto the property at 140 Drummer Avenue violated his (Fugate's) rights under the Fourth Amendment and that, therefore, his observations of the black Cadillac, the currency and other evidence could not be utilized to support the issuance of the search warrant. Defendant also contends that the warrantless entry into the residence at 140 Drummer Avenue violated his rights under the Fourth Amendment and that, therefore, the observations of Zimmerman and Lynott therein cannot be considered when deciding whether Copley's affidavit established probable cause to search that residence. As a means of analysis, the Court will address those two issues in the above order.

Before engaging in that analysis, however, it bears emphasis that information discovered in violation of a defendant's Fourth Amendment rights must be "removed from the affidavit executed to obtain a search warrant when determining whether the warrant was supported by probable cause." United States v. Davis, 430 F.3d 345, 357-58 (6th Cir. 2005). Therefore, any such

---

[7]In addition to the currency, cash register drawer, hooded sweatshirt and green mask, officers seized a Smith & Wesson, 9 mm pistol from a bedroom inside 140 Drummer Avenue.

information set forth in Copley's affidavit cannot be considered in determining whether that document established probable cause to search 140 Drummer Avenue, its curtilage and the black Cadillac parked thereon. Since all information set forth in that affidavit which establishes probable cause is based on the observations of Saylors, Zimmerman and Lynott, that document does not remotely establish probable cause, if the information based on the observations of those three officers are disregarded. Indeed, the Government does not argue to the contrary.

In his affidavit, Copley set forth information which was related to him by Saylors, regarding the observations of the latter when he initially entered the backyard at 140 Drummer Avenue, as well as his observations of the Deputy Sheriff's dog. According to the Defendant, that information cannot be considered when deciding whether the search warrant was supported by probable cause.

As an initial matter, this Court agrees with Defendant that the evidence established that Saylors' observations were all made as a result of his entry into that backyard. Government's Exhibit 3 shows the back of 140 Drummer Avenue, in a photograph taken from the alley behind that residence. During the oral and evidentiary hearing, Saylors testified that Exhibit 3 depicts exactly what he could see from the alley when he arrived at the rear of the residence located at 140 Drummer Avenue. See Transcript of November 1, 2010 Oral and Evidentiary Hearing (Doc. #29) at 11. The photograph shows the top 12 to 18 inches of a black automobile. From that Exhibit, it is not possible to determine whether that vehicle was a Cadillac and if it had visible license plates. Moreover, Saylors did not

observe the currency until after he had entered the backyard of that residence. It is self-evident that the dog would not have followed the path of currency beyond where it ended to the front door of that residence, if it had not been on that property.

Thus, the question becomes whether the warrantless entry onto the property at 140 Drummer Avenue violated Defendant's rights under the Fourth Amendment. According to the Defendant, there was such a violation, given that Saylors obtained the information he supplied to Copley by entering the curtilage of the residence at 140 Drummer Avenue without a warrant. It is not questioned that the curtilage of a residence is protected under the Fourth Amendment. Oliver v. United States, 466 U.S. 170 (1984).

In United States v. Dunn, 480 U.S. 294 (1987), the Supreme Court discussed the analytical framework which should be utilized when determining the extent of a home's curtilage:

> Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by. See California v. Ciraolo, 476 U.S. 207, 221 (1986) (POWELL, J., dissenting) (citing Care v. United States, 231 F.2d 22, 25 (CA10), cert. denied, 351 U.S. 932 (1956); United States v. Van Dyke, 643 F.2d 992, 993-994 (CA4 1981)). We do not suggest that combining these factors produces a finely tuned formula that, when mechanically applied, yields a "correct" answer to all extent-of-curtilage questions. Rather, these factors are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration—whether the area in question is so intimately tied to the home itself that it should be placed under the home's "umbrella" of Fourth Amendment protection.

Id. at 301 (footnote omitted). It has been noted that certain Dunn factors are less important when deciding the extent of the curtilage of an urban dwelling, as opposed to that of a rural home.[8] United States v. Acosta, 965 F.3d 1248, 1256 (3d Cir. 1992). In particular, the Acosta court held that the inquiry will center on the use to which the area is put, given that fencing and efforts to protect and shield the area from the view of those passing by are less important in an urban setting. Id.

Herein, other than citing the Dunn factors, the Government has not addressed the question of whether the portion of the backyard of 140 Drummer Avenue, onto which Saylors intruded in order to look at the automobile parked thereon, was part of the curtilage of that residence. Indeed, such an argument would have been fruitless. That area of the backyard does not appear to be more than 10 to 20 feet from the rear of that residence. Moreover, the evidence before the Court causes it to find that the area was used for purposes associated with a family's use of its home. For instance, Saylors went to an area that was between the house and an above ground swimming pool. There were children's toys in that area. Thus, he intruded onto an area where the family would gather. Accordingly, this Court concludes that Saylors intruded onto the curtilage of the residence at 140 Drummer Avenue, in order to determine that the automobile parked thereon was a black Cadillac and to observe the currency and other evidence.

While not arguing that the Court should conclude otherwise, the Government does contend that Saylors did not violate the Fourth Amendment. To support that

---

[8] In Dunn, the Court held that a barn on a ranch was not within the curtilage of the home on the ranch.

- 8 -

assertion, the Government relies on the principle that "'[t]he Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.'" Widgren v. Maple Grove Township, 429 F.3d 575, 582-83 (6th Cir. 2005) (quoting California v. Ciraolo, 476 U.S. 207, 213 (1986)). The present prosecution, however, involves far more than the inspection of the curtilage of an individual's residence from a lawful vantage point. Rather, it was not until he had physically intruded into the curtilage of 140 Drummer Avenue, an area in which Fugate and other residents of that house had a reasonable expectation of privacy, that Saylors could ascertain that the vehicle parked in its backyard was a Cadillac with no license plates and that he was able to observe the other evidence.

In Widgren, the Sixth Circuit held that a county tax assessor did not violate the plaintiffs' rights under the Fourth Amendment, when he made a warrantless entry onto the curtilage of their property, in order to ascertain the size of a newly constructed cabin located thereon by counting the concrete blocks used on its foundation.[9] The Sixth Circuit based its conclusion on a number of factors, most prominently that the tax assessor conducted the inspection as part of an administrative action, for tax purposes, rather than during the course of a criminal investigation. 429 F.3d at 584-85.

---

[9]The cabin had been built without the requisite building permit. Consequently, there was no record of the size of the cabin.

- 9 -

In <u>Jacob v. Township of West Bloomfield</u>, 531 F.3d 385 (6th Cir. 2008), a land ordinance enforcement officer entered the curtilage of plaintiff's property, in order to investigate complaints about its condition.[10] The Sixth Circuit affirmed the decision of the District Court to overrule the officer's motion for summary judgment, concluding that the officer had violated the plaintiff's rights under the Fourth Amendment, as a result of his warrantless entry onto the curtilage of his home. The <u>Jacob</u> court distinguished <u>Widgren</u> on the basis that the tax assessor in the latter case had entered onto the curtilage of the plaintiffs' property as part of an administrative proceeding, to determine the size of the newly constructed cabin solely for tax purposes and not as part of a criminal investigation. In contrast, in <u>Jacob</u>, the purpose of the warrantless entry was not purely administrative; rather, the warrantless search of the curtilage of plaintiff's property carried with it "the very real threat of criminal sanctions." 531 F.3d at 390. Similarly, herein, there is no hint that Saylors and other officers entered onto the curtilage of 140 Drummer, without a warrant, for an administrative purpose. On the contrary, Saylors made his intrusion for the purpose of furthering a criminal investigation, in order to determine whether the car parked in the backyard was the black Cadillac without license plates, in which the suspected perpetrator of the armed robbery of the Kwik N Kold had driven away from that commercial establishment. <u>See also</u> <u>United States v. Jenkins</u>, 124 F.3d 768 (6th Cir. 1997) (holding that the backyard of defendant's house was part of the curtilage of the property and that seizure of

---

[10]Abandoned automobiles and other "castoff material" was located in the yard surrounding the plaintiff's house.

- 10 -

items from that yard violated the Fourth Amendment, given that officers did not notice the items until they had made their warrantless entry onto the backyard).

Nevertheless, the Government argues that the warrantless entry into the residence at 140 Drummer Avenue was justified under the exigent circumstances exception to the warrant requirement. The Supreme Court recently restated that doctrine:

> Although the text of the Fourth Amendment does not specify when a search warrant must be obtained, this Court has inferred that a warrant must generally be secured. "It is a 'basic principle of Fourth Amendment law,'" we have often said, "'that searches and seizures inside a home without a warrant are presumptively unreasonable.'" Brigham City v. Stuart, 547 U.S. 398, 403 (2006) (quoting Groh v. Ramirez, 540 U.S. 551, 559 (2004)). But we have also recognized that this presumption may be overcome in some circumstances because "[t]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" Brigham City, supra, at 403; see also Michigan v. Fisher, — U.S. —, —, 130 S.Ct. 546, 548 (2009) (per curiam). Accordingly, the warrant requirement is subject to certain reasonable exceptions. Brigham City, supra, at 403.
>
> One well-recognized exception applies when "'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." Mincey v. Arizona, 437 U.S. 385, 394 (1978); see also Payton, supra, at 590 ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant").
>
> This Court has identified several exigencies that may justify a warrantless search of a home. See Brigham City, 547 U.S., at 403. Under the "emergency aid" exception, for example, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Ibid.; see also, e.g., Fisher, supra, at 546 (upholding warrantless home entry based on emergency aid exception). Police officers may enter premises without a warrant when they are in hot pursuit of a fleeing suspect. See United States v. Santana, 427 U.S. 38, 42-43 (1976). And — what is relevant here — the need "to prevent the imminent destruction of evidence" has long been recognized as a sufficient justification for a warrantless search. Brigham City, supra, at 403; see also Georgia v. Randolph, 547 U.S. 103, 116, n. 6 (2006); Minnesota v. Olson, 495 U.S. 91, 100 (1990).

Kentucky v. King, — U.S. —, 2011 WL 1832821 (May 16, 2011).

Herein, the Government does not argue that the exigencies of hot pursuit or the imminent destruction of evidence are applicable. Rather, it relies upon the emergency aid exception, i.e., the need to enter the residence in order to prevent harm to a third person, which flowed from the officers fear that a hostage was being held in the residence at 140 Drummer Avenue. That fear flowed from the violent nature of the robber of the Kwik N Kold (he had shot a clerk at that commercial establishment and at individuals who followed him), coupled with the probable cause they had to believe that the robber was in that residence. That probable cause is, however, based solely upon Saylors' observations of evidence <u>after</u> he had unlawfully entered onto the curtilage of that residence. The Government has not cited authority which would support the application of this exception in a situation where the officers illegally obtained the evidence which led them to believe that an exigency existed.

As indicated, the Defendant also argues that the observations of Zimmerman and Lynott cannot be utilized to support the issuance of the search warrant, since their warrantless entry into the residence at 140 Drummer Avenue was not supported by exigent circumstances. The Government, in contrast, contends that the entry was so supported, the exigent circumstances being the fear that a hostage may have been held inside that residence.[11] The Government points out

---

[11] The officers' theory that there might be a hostage in the residence at 140 Drummer Avenue is predicated on the evidence they had discovered there (i.e., the Cadillac without license plates, the currency both in the car and leading to the front of that house and the cash register drawer) and the fact that the robber of the

- 12 -

that the officers had probable cause to believe that the lone gunman, who had robbed the Kwik N Kold, wounding a clerk with a gunshot and shooting at other individuals, was inside that residence.[12] The flaw in that argument is that the officers' cause to believe that said individual was inside that residence is fruit of the poisonous tree, i.e., Saylors' warrantless entry onto the curtilage of that residence, which permitted him to determine that the black Cadillac without license plates was parked in the backyard and to observe the currency and other evidence.[13]

Moreover, the Government does not argue that the suppression of the evidence seized from the residence at 140 Drummer Avenue and its curtilage is not warranted in accordance with the good faith exception to the exclusionary rule established by United States v. Leon, 468 U.S. 897 (1984). Such an argument would have been fruitless. The Leon Court held that the good faith exception to the exclusionary rule is inapplicable, inter alia, "when the affidavit in support of the warrant is 'so lacking in indicia of probable cause as to render official belief in its

---

Kwik N Kold had shot a clerk therein and had shot at the citizens who followed him.

[12] The Government does not argue that the initial search by Zimmerman and Lynott was justified as a protective sweep or as a search incident to an arrest. Regardless, their entry into the residence at 140 Drummer Avenue was unlawful, so that neither exception would be applicable. Moreover, in Arizona v. Gant, — U.S. —, 129 S.Ct. 1710 (2009), the Supreme Court held that, incident to a lawful arrest, an officer may only search the arrestee and the area under his immediate control. The scope of the search conducted by Zimmerman and Lynott far exceeded that limitation.

[13] The Government did not present evidence or argue that officers would have entered the residence at 140 Drummer Avenue, if Saylors had not observed the Cadillac without license plates and other evidence after he had physically intruded onto the curtilage of that residence.

- 13 -

existence entirely unreasonable.'" 468 U.S. at 923. Herein, after one disregards the information in Copley's affidavit based upon Saylors' illegal entry onto the curtilage of the residence at 140 Drummer Avenue and the subsequent illegal search of that house, there is absolutely no information establishing probable cause to believe that evidence of a crime would be found therein. Quite simply, belief that Copley's affidavit, minus the illegally obtained information, established probable cause would not only have been unreasonable, it would have been fanciful.

In sum, this Court concludes that Saylors' warrantless entry onto the curtilage of the residence at 140 Drummer Avenue violated the Fourth Amendment. As a consequence, all his observations were made in violation of that constitutional provision, and the observations of Zimmerman and Lynott, made as a result of their warrantless entry into that residence were fruit of the poisonous tree. Moreover, the violation of the Fourth Amendment has not been purged by the issuance of the search warrant, since it was based on information that was obtained in violation of that Amendment. Accordingly, the Court sustains the Defendant's Motion to Suppress Evidence (Doc. #21).

May 27, 2011

                                        */s/ Walter Herbert Rice*
                                        WALTER HERBERT RICE, JUDGE
                                        UNITED STATES DISTRICT COURT

Copies to:

Counsel of Record.